IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

JAMIE C. SCHILLING and          §
KATELYN ELIZABETH BROOKS        §
for themselves and all others   §
similarly situated              §
V.                              §          A-14-CV-1049-LY
                                §
MID-AMERICA APARTMENT           §
COMMUNITIES, INC. & MID-AMERICA §
APARTMENTS, LP                  §

## ORDER

Before the Court is: Plaintiff's Opposed Motion to Compel Discovery (Dkt. No. 61);

Defendants' Response to Motion to Compel Discovery (Dkt. No. 65); and Plaintiffs' Reply (Dkt. No.

66). The Court held a hearing on all referred motions and responses on Tuesday, May 17, 2016. At

the hearing, the Court orally granted the parties' motions for certain emails to be reviewed *in camera*

by the Court. Having reviewed the documents *in camera*, the Court enters the following Order as to

disclosure of the documents.

### I. Background

Plaintiffs Jamie C. Schilling and Katelyn Elizabeth Brooks, who describe themselves as

"boyfriend and girlfriend living together," sue their landlord, Mid-America Apartment Communities,

Inc. and Mid-America Apartments, L.P. (collectively "MAA"), alleging that MAA improperly

charged water connection fees in violation of the Texas Water Code. Dkt. Nos. 15, 24 at 3 n.2.

Plaintiffs sue on behalf of a proposed class of current and former residential tenants of over 19,000

dwelling units in approximately 62 apartment communities in Texas where Defendants are the owner

or landlord. The present dispute relates to emails between MAA and American Utility Management,

Inc., a third-party company MAA contracted with to coordinate utility billing to MAA's tenants.

The issue before the Court is narrow.  MAA contends that 11 emails that passed between employees of MAA and employees of AUM, sent a year before the case was filed, are attorney-client communications and therefore exempt from discovery.  Plaintiffs contest this, and argue that the communications are between non-lawyer employees of the two companies, sent in the ordinary course of business, about the subject matter of the parties' contractual relationship.

MAA argues that the emails are subject to the attorney-client privilege because under the written agreement between AUM and MAA, AUM agreed to provide "full legal support," and to ensure that "all terms under this contract are executed in accordance with all pertinent governing jurisdictions' laws and regulations."  MAA asserts that in carrying out its responsibilities under their contract, AUM provided MAA with legal advice concerning tenant billing and utility allocation. MAA also points out that on its website, AUM states it provides its landlord customers "legal and regulatory expertise in industry laws and regulations."  MAA asserts that it regularly sought advice from AUM about what it was, or was not, permitted to bill to tenants, including advice about compliance with various states' billing and utility regulations.  The communications were sent to AUM representatives (such as Vice President - Client Manager Jacki Caputo), and by the AUM employees to AUM's general counsel, Jeffrey Peterson.  MAA contends that Peterson's legal advice was funneled back to MAA through AUM employees.

## II.  Analysis

The parties agree that Texas law governs the attorney-client privilege analysis in this diversity action.  *See* FED. R. EVID. 501.  When a party is claiming that a document is subject to the attorney-client privilege, it bears the burden of proving each of the elements of the privilege.  *Hodges, Grant & Kaufmann v. U.S. Gov't, Dep't of the Treasury*, 768 F.2d 719, 721 n.7 (5th Cir. 1985).  "A clear

showing must be made which sets forth the items or categories objected to and the reasons for that objection." *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 473 (N.D. Tex. 2004).  Thus, if a party fails to produce evidence in support of any one of the elements of the privilege, the document is not entitled to protection.  In a corporate setting, the privilege extends to any employee of the corporation who, on instructions from a superior, communicates with inside or outside counsel on behalf of the corporation.  *Upjohn v. United States*, 449 U.S. 383, 394–95 (1981).  But the privilege only attaches to communications made for the purpose of giving or obtaining legal advice or services; it does not apply to business or technical advice or management decisions.  *Id.*; *Navigant*, 220 F.R.D. at 473.

For a communication to be subject to the attorney-client privilege is must be: (1) a confidential communication; (2) made for the purpose of facilitating the rendition of professional legal services; (3) between or amongst the client, lawyer, and their representatives; and (4) the privilege has not been waived.  TEX. R. EVID. 503(b); *Huie v. DeShazo*, 922 S.W.2d 920, 923 (Tex. 1996).

## A.    "Between or Amongst the Client, Lawyer, and their Representatives"

Because it is fundamental to the issue before it, the Court first addresses MAA's novel argument that, through its vendor relationship with AUM, it became the "client" of AUM's in-house attorney.  MAA has been unable to provide the Court with any case in which a court has made such a finding on similar facts. This is likely because the argument is so odd that no court has ever been presented with it.  The Court has struggled with this order, not because it presents a particularly challenging decision, but rather because MAA's claim is so unorthodox, so far-fetched, that it is difficult to address in the context of existing case law.

Generally, the attorney-client privilege covers communications made by a corporate employee when they concern matters pertinent to the employee's job and the information is sought by the corporation's attorney in order to formulate and render legal advice to the corporation. *See Upjohn Co.*, 449 U.S. at 394-95. About the only factual aspect of the present dispute that is clear is the identity of the attorney in the alleged attorney-client relationship, because there is only one attorney who had any relationship to the communications at issue—Jeffrey Peterson, the general counsel of AUM. Though MAA had its own in-house general counsel at this time, Dkt. No. 66-2 at 100-101, none of the communications at issue here took place between MAA's employees and MAA's in-house attorney. Instead, all of the communication were between MAA employees, and AUM employees, who MAA contends were simply passing on the legal advice of *AUM's* in-house attorney.

MAA's evidence demonstrating the existence of an attorney-client relationship with AUM's general counsel is thin. Conspicuously absent from the record is any declaration from AUM or AUM's in-house attorney addressing whether either that corporation or its attorney believed that it had established an attorney-client relationship with MAA, or that it was providing legal advice to MAA in these emails. Instead, the only evidence MAA has given the Court on this point is the declaration of MAA Vice President James Maclin, who states that he believed that he was seeking legal advice from AUM in the emails, and that the advice would be provided by an attorney. Dkt. No. 65-1 at ¶ 6. Even this evidence is doubtful, though, as Maclin's deposition testimony on this point was different:

> Q      Under the contracts that we identified in Exhibits 28 through 31, did you understand those contracts to include the providing of legal services by AUM to MAA?

A       My—my interpretation would be that AUM was to provide some regulatory guidance—

Q       Right.  Right.

A       —based upon the services that they provided Colonial Properties.

Q       Okay.  But you agree with me that you don't have to be a lawyer to understand regulations, right?

A       Yes.

Dkt. No. 66-2 at 120-21.  Further, Mr. Peterson, AUM's general counsel, was neither the sender, nor the recipient, of any of the emails.  Rather, he is copied on only one email, and is not a party, in any capacity, to the other 10 emails.

As mentioned, there are few, if any, helpful opinions addressing a privilege claim like that made by MAA.  Some fact scenarios come close.  For example, courts have held that, in some circumstances, communications between a corporation's in-house attorney and an independent contractor or other non-employee working for the corporation can be privileged.  *See LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 661 F.Supp.2d 958, 961-963 (N.D. Ill. 2009).  But that is not what is before the Court in this instance.  MAA was not acting as AUM's agent in any respect.  Instead, MAA was AUM's customer.  The proper description of the facts here is not that MAA was acting as an agent of AUM, and AUM was passing on legal advice to MAA in the context of a principal-agent relationship; rather, MAA was AUM's customer, and AUM employees sought legal advice from their legal counsel on questions related to the services AUM was providing to MAA, and then shared those opinions in their communications with MAA.

A factually closer situation was addressed in *In re Vioxx Products Liability Litigation*, 501 F. Supp. 2d 789 (E.D. La. 2007). In that case, Merck retained outside advertising agencies on an

ongoing basis and vetted every advertisement and communication those agencies created with the

Merck in-house legal department to ensure compliance with strict FDA advertising regulations.

Merck asserted that the advertising agencies were acting as Merck agent-employees, and thus

communications between Merck and the ad agencies were subject to the attorney-client privilege.

To assist in the resolution of the complex attorney-client privilege claims made by Merck, the district

judge assigned Prof. Paul Rice as a special discovery master.   Prof. Rice is the author of a well-

respected treatise on the attorney-client privilege, and he quotes from his report in the *Vioxx*

litigation in one chapter of the treatise:

> Merck is now claiming that consultants should permissibly be brought within the
> circle of confidentiality because they, the consultants, could be assisted by directly
> receiving advice from the corporation's lawyers. We are not willing to take this step
> in the expansion of the privilege because it makes a mockery of the privilege's
> limited purpose and rationale, and further renders the concept of confidentiality
> meaningless. With the advent of electronic communications and the vastly expanded,
> albeit inappropriate, assertion of privilege claims by corporations, privilege
> resolution process in litigation has become one of the most costly endeavors. Here,
> for example, the court has not only had to address the issue of confidentiality within
> the Merck corporate structure, but also within each organizational structure of each
> consulting firm. Every expansion adds complexities, that in turn add cost and
> confusion to the process. This added expansion would particularly have that effect.

Paul Rice, ATTORNEY-CLIENT PRIVILEGE § 4:19  (Thomson West 2d ed. Supp. 2009).   The court

thus declined to extend the privilege to the communications between Merck employees and the ad

agency employees.   Once again, the facts of this case are less favorable to the assertion of the

privilege than in the *Vioxx* litigation.   There, the ad agencies were Merck's agents, hired by Merck

to work at Merck's direction.   Here, MAA was not working on behalf of AUM, but instead AUM

was working for MAA.

As noted at the outset, MAA bears the burden of establishing that it had formed an attorney-client relationship with AUM's general counsel, and that the emails sent by AUM employees to MAA were merely conveying Mr. Peterson's legal advice to MAA.  Other than the conclusory statements in Maclin's declaration, which are inconsistent with his deposition testimony, there is no evidence to support this claim.  Further, the Court can find no legal basis to conclude that such a relationship has ever been recognized in this setting.  The evidence, including the Court's review of the subject emails, demonstrates that any legal or business advice given by AUM's in-house counsel was given to AUM's employees, for the benefit of AUM.  AUM's employees' decision to share that information with their customer did not extend any privilege that might exist to that customer.  MAA has wholly failed to carry its evidentiary burden of establishing that an attorney-client relationship existed between MAA and AUM's general counsel, Jeffrey Peterson, and its assertion of a privilege as to the emails fails for this reason.

**B.     Alternative Grounds**

Although the Court has found that MAA failed to demonstrate the existence of a lawyer-client relationship, there are other, independent reasons that its privilege claim fails.  They are discussed in the following sections.

**1.     Confidentiality**

In the corporate context, demonstrating the confidentiality element of the privilege is important, particularly in the age of email and the ease with which communications can be shared.  As relevant here, Rule 503 of the Texas Rules of Evidence provides that the privilege applies to communications "between the client or the client's representatives and the client's lawyer or the lawyer's representative."  TEX. R. EVID. 503(b)(1)(A).  A communication is "confidential" if it is not

7

intended to be disclosed to third persons other than those "to whom disclosure is made to further the rendition of professional legal services to the client" or "reasonably necessary for the transmission of the communication." TEX. R. EVID. 503(a)(5)(A) & (B).  One aspect of confidentiality requires that the party invoking the attorney-client privilege show that each person privy to the communication: (1) had the authority to obtain professional legal services on behalf of the client; (2) had authority to act on legal advice rendered to the client; or (3) made or received the confidential communication while acting within the scope of his employment for the purpose of effectuating legal representation to the client. *Navigant*, 220 F.R.D. at 480 (citing *Seibu Corp. v. KPMG LLP*, 2002 WL 87461 at *2 (N.D. Tex. Jan. 18, 2002)); TEX. R. EVID. 503(a)(2)(A)-(B)).

The emails at issue were distributed to many recipients, several of whom are not identified in any of the evidence before the Court.  The most detail given regarding the roles of these recipients is contained in James Maclin's declaration, where he states that he "requested legal advice from AUM in connection with certain of my job responsibilities, and I directed certain employees (including Rebecca Wade) to obtain such advice from AUM pursuant to the Agreement." Dkt. No. 65-1 at ¶ 7.  The "certain employees" mentioned in the declaration are not identified.  But there are various individuals copied on the emails other than Maclin or Wade.[1]  Further, the emails are not marked "privileged" or "confidential," nor do they contain any disclaimer that they contain legal advice.  By not giving the Court any evidence of who these individuals are, and whether they qualify as either persons to whom disclosure was made "to further the rendition of professional legal

---

[1] Specifically, one or more of the emails were distributed to Pat Flanigan, Amy Pearson, Carolyn Diehl, Chad Edwards, Audwin Washington, and Michael Schaeffer.  There is no evidence as to who these people are, what their roles at either AUM or MAA is, and whether they had been empowered by AUM or MAA to participate in the giving or seeking of legal advice.

services to the client," or persons "reasonably necessary for the transmission of the communication,"

TEX. R. EVID. 503(a)(5)(A) & (B), MAA has again failed to carry its evidentiary burden.

This is not a novel legal principle, as numerous courts have rejected privilege claims by

corporations for this very reason.  For example, a court in the Northern District of Illinois stated in

one case:

> Whether in the form of supporting affidavits or additional detail in the privilege log
> [the privilege proponent is] required to provide additional facts as to the identity and
> function of those individuals included in the communication to establish that the
> 'employee ma[de] the communication at the direction of his superiors in the
> corporation' or that 'the subject matter upon which the attorney's advice [was]
> sought by the corporation and dealt with in the communications [was] the
> performance by the employee of the duties of his employment.' A name and
> ambiguous or undefined job title do little to substantiate that the confidentiality of the
> communications was not compromised by disclosure to individuals outside the
> attorney-client relationship.

*Muro v. Target Corp.,* 243 F.R.D. 301, 308 (N.D. Ill. 2007) (internal citations omitted).  That is

exactly the case here.  Thus, the Court finds that MAA has failed to establish that the emails—even

if they are considered communications between a lawyer and a client—were "confidential."

**2.     "Made to facilitate the rendition of professional legal services"**

Plaintiffs also contend that MAA has failed to show that the emails were sent for the purpose

of facilitating the rendition of professional legal services; rather Plaintiffs argue that the emails in

question relate to "day-to-day operations" and "routine business affairs."  The distinction between

an in-house attorney giving legal advice and the attorney giving business advice has become an

important part of this analysis as the role of in-house attorneys has grown.  But the basic legal

principle that, to be privileged, a communication involving in-house attorneys must have been made

to facilitate the rendition of legal services was established long ago.  For example, a New York

district court stated in 1974 that "[i]f the document was prepared for purposes of simultaneous review by legal and nonlegal personnel, it cannot be said that the primary purpose of the document is to secure legal advice." *United States v. International Business Machines Corp.*, 66 F.R.D. 206, 213 (S.D. N.Y. 1974). *See also United States v. Chevron Corp.*, 1996 WL 444597 (N.D. Cal. 1996) ("When a document is prepared for simultaneous review by non-legal as well as legal personnel, it is not considered to have been prepared primarily to seek legal advice and the attorney-client privilege does not apply.").

The only evidence MAA points to on this point is its contract with AUM, and statements on AUM's website. Specifically, MAA relies on the portion of The Utility Billing and Energy Management Agreement that identifies the "BILLING SERVICE PROVIDED BY AMERICAN UTILITY MANAGEMENT, INC." One of the services listed under that heading is "[f]ull legal support as needed by [MAA]." Dkt. No. 61-8 at ¶ 3. MAA notes as well that the agreement states that AUM is to ensure that "all terms under this contract are executed in accordance with all pertinent governing jurisdictions' laws and regulations." *Id.* at ¶ 11. MAA also relies on the language on AUM's website which states that AUM provides, among many other things, "legal and regulatory expertise in industry laws and regulations" to its clients. Dkt. No. 66-1 at 8.

What is lacking from MAA's argument is any analysis of the emails themselves, and whether they can fairly be read to be solely addressed to legal matters, or if instead are properly construed as also concerning business issues. On this point, MAA's evidence is again insufficient. First, none of the emails were directed to AUM's general counsel, Jeffrey Peterson. They were directed to rank and file AUM employees who, it would appear on their own initiative, solicited advice from Mr. Peterson before responding to the MAA employees' questions. Further, Peterson never addressed

his responses containing the alleged legal advice, to an MAA employee.  Instead, he responded to AUM employees.  In addition, the emails seek advice regarding the very services that AUM provides to its clients—the billing of tenants.  This is akin to the situation in *Baptist Health v. BancorpSouth Ins. Servs., Inc.*, 270 F.R.D. 268, 276 (N.D. Miss. 2010), where the court noted that "the critical inquiry is whether any particular communication facilitated the rendition of predominantly legal advice or services to the client."  MAA employees were writing to AUM employees asking for guidance on what they were permitted to bill for, and AUM answered those questions directly, after seeking input from its own counsel.  The emails were primarily business conversations between AUM and its customer.

The path that the communications followed further supports this conclusion.  As has been noted, none of MAA's messages were sent to Peterson, and not a single response to MAA was sent from Peterson.  Instead, all of the conversations were between non-lawyer employees, who appear to have dealt with each other regularly on business matters.  The agreement  between MAA and AUM is *not* a legal services agreement, but rather is entitled "Utility Billing and Energy Management Agreement." The first paragraph of the Agreement describes the "Services Provided" as "monthly billing services for the approximately 50,000 apartment units owned by Colonial." Dkt. 61-8 ¶ 1. While the Agreement does make provision for "full legal support," this term is not defined in the contract, and there is no evidence that MAA expected AUM to advise it on anything other than the application of laws and regulations to billing practices, which is AUM's business.  And the evidence shows that on various occasions AUM's non-lawyer employees gave advice about regulations to MAA, without first talking to AUM's in-house counsel.

To put this point in one final way, in the words of TEX. R. EVID. 503, for the privilege to apply to these communications, the AUM employees who conveyed the alleged legal advice to MAA would have to be considered a "lawyer's representative."   Rule 503 provides that for a communication to be privileged it must be "between the client or the client's representative and the client's lawyer or the lawyer's representative."   TEX. R. EVID. 503(b)(1)(A).   Under MAA's argument, the "client" must be MAA, its employees are "the client's representative" and the client's lawyer is Peterson.   Because the communications were between MAA employees and AUM employees (other than Peterson), to fit under the rule, the AUM employees would have to be considered "the lawyer's representative."   But that term is defined in Rule 503 as someone "employed by the lawyer to assist in the rendition of legal services" or "an accountant reasonably necessary for the lawyer's rendition" of legal services.   TEX. R. EVID. 503(a)(4).   There is no evidence in the record that would allow the Court to conclude that any of the AUM employees were "employed by [Peterson] to assist in the rendition of legal services," or were accountants necessary for that.

Having reviewed the emails, the Court finds that the emails were not sent to facilitate the rendition of professional legal services, but instead involved general questions relating to the billing services provided by AUM to MAA. As such they are not protected by the attorney-client privilege.

### C.   *In camera* review

As mentioned, in reaching its conclusions, the Court considered the emails themselves, which were submitted to the Court for review *in camera*.   Given the conclusions set forth above there is no need to go through the documents one-by-one, or to otherwise apply the Court's findings to the documents on an individualized basis.   The Court does make the following, observations, however.

12

The sole document on which the attorney is copied is PRIV0000002.  Notably, Peterson is copied by an AUM employee, along with others, and the email contains no legal opinions.  Documents numbered P-MAA-SCHI0000001-6, AUM0001858, PRIV0000008, and PRIV0000010 (several of which duplicate a single email chain) each contain italicized text which is described in the email as having been received by an AUM employee from AUM's in-house counsel, and then duplicated and pasted into the email.  But because MAA was not the in-house counsel's client (as discussed in detail above), the transmission of the in-house attorney's words was in effect a waiver of the privilege between the AUM employee and her in-house attorney.  Finally, all of the documents contain discussion of ordinary business matters, and all of them were circulated to one or more of the people listed in footnote 1 (who are not identified in MAA's evidence).

### III. Summary and Order

IT IS THEREFORE ORDERED that Plaintiff's Opposed Motion to Compel Discovery (Dkt. No. 61) is GRANTED and, unless an appeal is taken from this order in the time period set by FED. R. CIV. P. 72(a) and Rule 4(c) of Appx. C of the Local Rules of this Court, MAA shall produce to Plaintiffs all of the records it submitted to the Court for *in camera* review.

SIGNED this 9th day of June, 2016.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE